CHICAGO, DANVILLE AND VINCENNES RAILWAY CO. *et al.*

*v.*

BERTHOLD LŒWENTHAL.

1. FORECLOSURE—*sale of part of a railroad.* If a mortgage is given by a railway company upon its entire road to secure bonds issued by it, and it procures the grading of only a part of the road in the middle, and then abandons the work, leaving each end of the road unfinished, and another company organizes and completes the road, on bill to foreclose the mortgage given by the first company, it is erroneous to decree a sale of the middle portion of the road, leaving the two ends worthless. If any foreclosure can be had the entire road must be sold, and the proceeds distributed as between the bondholders of the original company and the new company in the proportion which

the work done by the first company bears to the cost or value of the entire road as completed.

2. ASSIGNMENT—*assignee of paper secured by mortgage in equity takes subject to all equitable defences.* As a mortgage is not assignable at law, though given to secure commercial paper, when a *bona fide* assignee or holder of such paper so secured seeks relief in equity ·by the foreclosure of the mortgage, the mortgagor may successfully interpose any defence which would have been availing against the original holder or payee of the paper.

3. Where the proof clearly shows that a railway company never received any consideration for bonds issued by it to the payee, a contractor, which bonds were secured by a mortgage on its road, this will constitute a good defence as against the payee or person to whom delivered, and as against a *bona fide* purchaser when seeking to foreclose the mortgage in a court of equity.

4. MORTGAGE—*the mortgagor must have the legal or equitable title.* Where a railway company executing a mortgage upon its road as contemplated, has no legal title to any of the right of way, but only contracts for a small portion thereof, to be conveyed upon conditions which it never performs, or has agreed to perform, and a new company is organized which builds the road and acquires the legal title to most of the right of way and is equitably entitled to the balance, no decree of foreclosure can be sustained under the mortgage, as against the new company, for the sale of its property. The mortgage · creditors of such original company have no rights superior to the company itself. In such case the original company has no such interest or title in the road as can be subjected to sale under the mortgage.

APPEAL from the Circuit Court of Cook county.

Prior to June, 1873, the Chicago, Danville and Vincennes *Railroad* Company—having a charter to build and operate a railroad from Danville, Illinois, to the city of Chicago—had built its road from Danville to a point in Cook county called Dalton, some twenty miles south of Chicago, and had it in operation, running its cars from Dalton into Chicago upon the track of another railroad company, whose track it intersected at Dalton. This corporation also owned or had some interest in a line of railroad extending from Danville, Illinois, to some point in Indiana. That part of this line lying in the State of Indiana was called "The Indiana Division" of the Chicago, Danville and Vincennes railroad.

This railroad company, prior to June, 1873, had it in contemplation to extend its line of railroad into Chicago by

taking out a branch at or near Thornton, in Cook county (a point on its road a few miles further south than Dalton), running from Thornton in a northwesterly direction, for a few miles, and then bearing northward so as to leave Blue Island to the eastward of its line, and, by crossing the Chicago and Alton railroad and the Illinois and Michigan Canal, to enter the city of Chicago on what is called the West Side. The line of this proposed branch was called the Blue Island Division, and was about 25 miles long.  To this end a part of the line was surveyed, and negotiations were opened with persons owning land on or near the proposed line, by which subscriptions were procured from divers persons, promising upon certain conditions to donate certain amounts of money to this *railroad* company, and also certain portions of the right of way on this proposed new line.  For some reason, and probably for want of funds, this railroad company suspended or abandoned that mode of accomplishing this project, and another plan was adopted.

On or shortly before the 14th of June, 1873, A. C. Jones, a clerk in the employment of the Chicago, Danville and Vincennes Railroad Co., C. Greenwood, its general freight agent, C. B. Mansfield, its general ticket agent, D. R. Pettibone, its paymaster, and J. S. Campbell, its auditor, entered into articles of association for the incorporation of a railroad company, under the general law of March 1, 1872, to be called " The Chicago, Danville and Vincennes Rail*way* Company," to construct and operate a line of railroad about $23\frac{1}{2}$ miles long, and from Chicago to a point on the line of the Chicago, Danville and Vincennes *railroad* (giving a description of a line substantially that along which the *railroad* company had procured the subscriptions for the donation of money and of certain parts of the necessary right of way); the incorporation to begin June 14, 1873, and to last fifty years. The capital stock to be $500,000.

The first board of directors of the Chicago, Danville and Vincennes *Railway* Co., named in these articles, were: W. D.

Judson, Amos Tenney, C. Greenwood, J. S. Campbell, J. P. Roberts, C. B. Mansfield and A. S. Dunham. Each of these was either an officer or employee of the Chicago, Danville and Vincennes Railroad Company.

The number of the shares were to be 5000, of the amount of $100 each.

These articles were duly filed for record June 19, 1873.

On the 24th of June. books were opened for subscriptions to the stock of this new company—"The Chicago, Danville and Vincennes *Railway* Company"—and stock was subscribed, as follows: Judson, 250 shares; Young, 500 shares; Tenney, 250 shares; Greenwood, 5 shares; Campbell, 5 shares; Roberts, 5 shares; Dunham, 5 shares, and Mansfield, 5 shares—1025 shares.

Each of these was either an officer or employee of the rail*road* company.

Judson, the president of the *railroad* company, was made president of the *railway* company; Tenney, the treasurer of the railroad company, was made treasurer of the *railway* company, and Campbell, the secretary of the railroad company, was made secretary of the *railway* company.

On the 24th of June, 1873, it seems the directors of the *railway* company held a meeting and passed resolutions for the issue of first mortgage coupon bonds to the amount of $500,000—that is 500 bonds of $1000 each, to be numbered from 4001 to 4500—at seven per cent interest, payable semi-annually, the principal payable April 1st, 1913, each bond to be dated July 1st, 1873, and directed, among other things, that these bonds should be prepared by the president and signed by him in behalf of the company and attested by the treasurer, with coupons attached authenticated by the secretary, and that the bonds should be authenticated by a certificate of the trustees, under the mortgage made to secure the same; and declaring that, to secure these bonds, the company would make and deliver to W. R. Fosdick and J. D. Fiske, as trustees, a deed of trust, for the benefit of every holder of

such bonds, or any of them, conveying "all the road of this company, (commencing in the city of Chicago, in sec. 24, T. 39, R. 13, and extending thence through the townships of Lake, Worth and Bremen to a point in Thornton township on the line of the Chicago, Danville and Vincennes railroad a distance of about 24 miles,) with all the property, rights and franchises of this company pertinent to said road between said terminal points;" and authorizing the president of said Chicago, Danville and Vincennes *Railway* Company to sign and seal the deed of trust and cause the same to be recorded, and "thereupon to make, sign, execute and prepare said $500,000 of bonds, for *issue and sale,* as shall be *hereafter ordered* by this board."

And afterwards, on the 1st day of July, 1873, W. D. Judson, as president of this new corporation, the Chicago, Danville and Vincennes Railway Company, prepared and signed, and sealed with the seal of said corporation, the coupon bonds mentioned in the above resolutions, (attested by Amos Tenney as treasurer,) with coupons attached, signed by J. S. Campbell as secretary of the company; in each of which bonds it was said, the Chicago, Danville and Vincennes Railway Company, for value received, acknowledges itself indebted to Joseph E. Young in the sum of $1000, which it promises to pay to him or bearer, etc.

And on the same day there was prepared and signed and sealed, in pursuance of said resolutions, a deed of trust to secure these five hundred bonds, which was duly acknowledged July 2, 1873, and filed for record on the 9th of July, 1873.

That deed contains recitals that the rail*way* company "has commenced to construct and put in operation a railroad" from Chicago to a point in the township of Thornton, etc., and has resolved to buy iron and other materials therefor, and rolling stock to be used thereon, and to borrow a portion of the money necessary for these purposes; also a full recital of the above resolutions, and also a statement that, in pursuance of these resolutions, the railway company has "made and exe-

cuted bonds therein mentioned, and hold the same to be authenticated, issued and disposed of for the purpose in said order and resolution stated."

Before the preparation of this trust deed and of these bonds, the Chicago, Danville and Vincennes Railroad Company had issued and put upon the market four thousand coupon bonds, secured by a like trust deed of all its railroad property, and the bonds of the railway company were so prepared that on their face they were like the bonds of the railroad company, in their language and in every respect except that the numbers of the railroad bonds run from 1 to 4000 inclusive, and the numbers of the railway bonds run from 4001 to 4500, and that, in the name, the old corporation was styled "*railroad*" company, and the new was styled in the name, "railway" company; and the trust deed of the railway company was in the very words of the trust deed of the railroad company, except the change of one syllable in the name, and except location and length of the line of railroad described and the number of the bonds secured. Each class of bonds was signed by the same name as president, by the same name as treasurer, and the coupons were signed by the same name as secretary, and the same men were named as trustees in both trust deeds, and verified both classes of bonds. In a word, these railway bonds were in such close imitation of the bonds of the railroad company, that prudent and careful men were very liable to suppose, on inspection of these bonds of the Chicago, Danville and Vincennes Railway Company, that they were the bonds of the Chicago, Danville and Vincennes Railroad Company, the corporation who had a railroad in full operation and whose bonds up to that time had a fixed market value.

Between the 9th of July, 1873, and the 7th of August of that year, five different subscriptions were made to the Chicago, Danville and Vincennes Railroad Company, by which about one mile of right of way was promised to the Chicago, Danville and Vincennes Railway Company upon condition that this railroad from Chicago to Thornton should be completed ready

for the cars by December 1, 1873, with a station at every section line through the towns of Lake and Worth, and operated with four daily trains with passenger accommodations, and that passes for three years should issue to all such subscribers and to all persons who should buy land for residence from such subscribers on the line of the road; and upon the same condition the sum of $18,500 in money was pledged to be donated.

On the 14th day of July, 1873, a contract was signed between the Chicago, Danville and Vincennes Railway Company, (by Judson as its president,) and Joseph E. Young, by which Young agreed to construct and equip this line of railroad from Chicago to Thornton, and to procure for that company the right of way and depot grounds, etc., and the railway company to pay him therefor $500,000 in first mortgage bonds, secured by an only mortgage on its road and property, and the further sum of $375,000 in full paid capital stock of that company, and Young was also to have as his own all donations, and was to complete the road. It was provided in this contract that monthly payments were to be made to Young in due proportion of the bonds and stock, as the work progressed, upon the estimates of the engineer in charge, and in order to fix a measure of these payments a schedule of the value of all the work and materials to be done and furnished by Young was to be prepared by the engineer and approved by Young, and upon this schedule of values the monthly estimates were to be computed and the payments made, and the title to all such property was to pass to the railway company as the payments were made from time to time.

Soon afterwards a contract and lease were executed by and between the Chicago, Danville and Vincennes Railway Company and the Chicago, Danville and Vincennes Railroad Company, bearing date September 5, 1873, by which the railway company, among other things, undertook to construct the line of railroad from Chicago to Thornton, and put on that line a certain amount of rolling stock; and leased its road

to the Chicago, Danville and Vincennes Railroad Company from January 1, 1874, for ninety-nine years, renewable forever; and among other things the Chicago, Danville and Vincennes Railroad Company undertook to keep the same in repair, to pay taxes, and also the interest which might accrue, after taking possession under this lease, on the $500,000 first mortgage bonds above spoken of, and at all times pay like dividends on the stock of the railway company as is paid on the stock of the railroad company; and it was agreed that the Chicago, Danville and Vincennes *Railway* Company should pay for all supplies and equipments before the time of taking possession, and all pay rolls and floating debt, so that there should at that time be no lien upon the road except the $500,000 of first mortgage bonds.

Some time in the month of September, 1873, a contractor by the name of Brown went upon this line of road and commenced the work of grading, and continued the work until some time in the month of November, 1873, in which time he graded about twelve miles of the line, being that part lying in the townships of Lake and Worth, and the controversy in this case is about this part of that line.

The appellee charges in his bill that this work was done by the Chicago, Danville and Vincennes *Railway* Company, while appellants insist that this twelve miles was graded by the Chicago, Danville and Vincennes Railroad Company.

Some time in the summer or fall of 1873, J. E. Young, having in his possession one hundred of the five hundred bonds above mentioned of the Chicago, Danville and Vincennes Rail*way* Company, at the request of Samuel J. Walker, of Chicago, lent to Walker certain of these bonds, to be used by Walker as collateral security in his own business.

After this, Walker deposited forty of these bonds with Reed, to secure certain checks of Walker which Reed held, and from Reed's hands and with Walker's consent twenty of these bonds were delivered to the International Bank and twenty of them were delivered to the National City Bank,

and these banks transferred these forty bonds to Lœwenthal, who afterwards filed this bill to foreclose the trust deed of the Chicago, Danville and Vincennes Railway Company, and to subject the twelve miles of railroad graded by Brown, as stated above, to sale for their satisfaction.

After Brown suspended work, in November, 1873, nothing more was done toward the construction of this new railroad until some time in the summer of 1874, as hereafter stated.

The Chicago, Danville and Vincennes Railway Company abandoned the construction of the railroad named in its charter, either before or after the grading above mentioned was done, (as claimed by appellants,) or at the close of that work in November, 1873, and after that took no further action towards its construction.

On the 26th of March, 1874, Edwin Walker, the attorney of the Chicago, Danville and Vincennes Railroad Company, Leonard Pearson, superintendent, Eugene Ellery, assistant treasurer, James E. Bradley, engineer, Wm. S. Milligan, clerk, and Joseph S. Campbell, auditor of the Chicago, Danville and Vincennes Railroad Company, signed articles of association as corporators, by which was created another railroad corporation, to be called "The Chicago and Southern Railroad Company," to construct a railroad "from the city of Chicago, in a southerly direction, through township 39, range 13 east of third principal meridian," all in the county of Cook, to commence April 1, 1874, and to last fifty years, the capital stock to be $250,000, and its first board of directors to be these very corporators.

Afterwards, and before the 12th of June, 1874,—probably about June 1, 1874,—all of these directors except Walker resigned, and the board was filled by the election of N. S. Bouton, B. V. Page, R. E. Goodell, —— Church and —— Hall. On the 12th of June, 1874, N. S. Bouton was made president of the Chicago and Southern Railroad Company, Page, treasurer, and Truesdale, secretary.

Before this, the donation subscriptions which had been

made to the railway company, and those made to the Chicago, Danville and Vincennes Railroad Company, had been assigned to the Chicago and Southern Railroad Company, and part of them had been presented to the subscribers, and their assent, in writing, procured to the assignment, and to an extension of time for the completion of the road, and with whom the Chicago and Southern Railroad Company had made a contract to comply with the terms of contract as made with the railroad party to the original contract, with modifications as to time of the completion of the road, and as to the times of payment and conveyance by the subscribers.

Soon after Bouton was made president, new contracts for the right of way and for donations of money (in the same manner as above stated) were consummated with most of the rest of the subscribers of donations, which had been assigned as above stated.

On the 24th of June, 1874, at a meeting of all the stockholders of the Chicago and Southern Railroad Company, resolutions were adopted, and spread upon the books of that corporation, authorizing an issue of first mortgage coupon bonds to the amount of $320,000—that is, three hundred and twenty bonds of $1000 each, with interest coupons, to be signed by the secretary, the bonds to be numbered from 1 to 320, to be dated as of June 1, 1874, and payable April 1, 1904, with interest payable semi-annually; and directing that these bonds be prepared by the president, and signed by him and attested by the secretary, and to have annexed to them an authentication by the trustee under the mortgage, and authorizing and directing the execution by the company of a trust deed, conveying all its property acquired, or to be acquired, to Henry A. Smythe, as trustee, to secure the payment of these three hundred and twenty bonds. On the same day, like resolutions were adopted by the board of directors of this corporation.

On the 27th of June, 1874, the Chicago and Southern Railroad Company entered into a contract with John B.

Brown to complete the railroad described in its charter, furnishing all the material except 25,640 cross-ties, at the contract price of $175,000, with a provision that the corporation might furnish the iron, and in that case it was to have credit on the contract for the sum of $110,880, leaving in that event $64,120 to be paid as the contract price.

On the 4th of July, the three hundred and twenty bonds of the Chicago and Southern Railroad Company and the trust deed provided for in the above resolutions were executed, and the trust deed was duly filed for record on the 24th of July, 1874.

On the 15th day of July, 1874, a contract was executed by the Chicago and Southern Railroad Company, by Bouton, its president, with the firm of J. E. Young & Co., by J. E. Young, reciting that J. E. Young & Co., and others interested with them, had procured for the Chicago and Southern Railroad Company the right of way for its entire line; and did grade twelve miles of the same; and did procure 30,000 ties for the same; and did procure subscriptions and donations of cash and lands valued at $125,000, all of which had been transferred to the Chicago and Southern Railroad Company; by which contract the Chicago and Southern company agreed to pay to said J. E. Young & Co. for said right of way, grading, ties and subscriptions, all that should remain of said proceeds of said subscriptions and of said issue of $320,000 of bonds, or the proceeds thereof, after paying all the cost and expenses of finishing and furnishing said railroad, and, when the whole should be completed, to transfer to the Chicago, Danville and Vincennes Railroad Company all of the stock of the Chicago and Southern Railroad Company then issued and outstanding.

On the same day, the Chicago and Southern Railroad Company leased its road, when completed, to the Chicago, Danville and Vincennes Railroad Company for ninety-nine years. The rent reserved was the payment by the lessee of the interest upon the three hundred and twenty first-mortgage bonds of

the lessor, described above, and the provision of a sinking fund to pay the principal of these bonds at maturity.

Soon after the issue of the three hundred and twenty first-mortgage bonds by the Chicago and Southern Railroad Company, sixty (60) of these bonds were delivered to Judson, who was one of the firm of J. E. Young & Co., and also president of the Chicago, Danville and Vincennes Railroad Company, in part payment, or in payment, for the right of way, grading, ties and donations which had been turned over to the Chicago and Southern Railroad Company, and in a short time thereafter these sixty (60) bonds were transferred to the Commercial National Bank in part payment of an indebtedness of the Chicago, Danville and Vincennes Railroad Company to the bank, and that bank still holds these bonds.

About this time Bouton, Goodell and Page, or some one or more of them, began to advance or lend money to the Chicago and Southern Railroad Company, (Mr. Bouton advancing most of this money,) upon the bonds of that corporation, which money was used in the construction and completion of the road; and before the filing of this bill Bouton and his associates, or some of them, had advanced a large amount of money for that purpose, and, as they claim, about the amount of $160,000, for which they received as collateral security first mortgage bonds of the Chicago and Southern Railroad Company. They, or some one or more of them, raised this money from time to time by giving individual paper to divers banks, not parties hereto, and pledging these bonds as collateral security for such loans. Among the banks from which money was thus obtained are, a National Bank at Ottawa, which holds one hundred of these bonds; the First National Bank of Chicago, which holds forty (40) of these bonds; Ford's Village Bank of Connecticut, which holds eighteen (18); the Union Saving and Trust Company, which holds eighteen (18); and Sidney Kent holds nineteen, and in other like hands are eighteen (18) other of these first mortgage bonds of the Chicago and Southern Railroad Company.

Some of these bonds were sold and the rest pledged, but the record fails to show to whom.

The road was chiefly constructed before the filing of the bill, and, before the decree, was finished, furnished and in actual operation by the Chicago, Danville and Vincennes Railroad Company, under its lease from the Chicago and Southern Railroad Company.

The decree of the circuit court granted the relief sought, declared the mortgage given by the Chicago, Danville and Vincennes Railway Company a first lien upon the twelve miles of this railroad which was graded in 1873, and ordered so much of this part of the road to be sold for the payment of whatever amount might be found due to parties holding any of the bonds secured by that mortgage, who had acquired them for value in good faith in the ordinary course of business; and from this decree the Chicago, Danville and Vincennes Railway Company, the Chicago and Southern Railroad Company, and the Commercial National Bank appeal, and seek the reversal thereof. Other facts appear in the opinion of the court.

Mr. E. Walker, for the appellants:

1. Contended that the mortgage, which is the basis of the decree, was not executed by proper authority, and, under the express provisions of the statute, is invalid. Rev. Stat. 1874, p. 804; *Commonwealth* v. *Smith et al.* 10 Allen, 448; *People ex rel. Fiedler* v. *Mead,* 36 N. Y. 224.

2. When bonds so issued are void, the fact that they are held by *bona fide* purchasers is immaterial, as parties who take them are presumed to know the statute law. *Adriance* v. *Roome,* 52 Barb. 399; *Bissell* v. *Michigan Southern Railroad,* 22 N. Y. 258; *United States* v. *City Bank of Columbia,* 21 How. 356; *Railway Co.* v. *Allerton,* 18 Wall. 233.

3. Had the mortgage been legally executed, the company never acquired or possessed any property to which the mortgage could attach, or upon which it could become a lien.

4.   The bill does not show that the complainant has any standing in a court of equity, for the purpose of foreclosing the mortgage under which he claims a lien upon the property of the railway company.

5.   It was error to decree a sale of a section only of the road, being twelve miles in its middle, the road being an entirety.

Messrs. Cooper, Packard & Gurley, for the appellee, after stating the facts and the pleadings, made the following among other points:

1.   The mortgage of the Chicago, Danville and Vincennes Railway Company is a prior lien on the twelve miles of railroad covered by the decree, for the benefit of the innocent holders of any of the railway bonds who acquired the same in the ordinary course of business, in good faith and for value.

2.   The Southern company, if considered as a mere trespasser, is as much estopped from claiming that the after acquired title to rights of way did not enure to the benefit of the bondholders of the railway company, and that accessions to the mortgaged property did not also come under the lien of the mortgage, in the same manner as if it had taken deed of conveyance from the railway company. *Somes* v. *Skinner*, 3 Pick. 31; Co. Lit. 352, b; 1 Rob. Abr. 868, Estoppel K. pl. 3; Herman on Estoppel, 239, 240.

3.   In the case at bar, the Southern company stands in the light of a privy in estate with the mortgagor corporation, the railway company, by receiving the assignments of contracts for rights of way, along with the possession of twelve miles of road bed covered by such agreements for rights of way; and under the previous authorities, whatever would estop the mortgagor would also estop the Southern company from claiming the after acquired title as exempt from the mortgage. *Phelps* v. *Blount*, 3 Dev. (N. C.) 117; *Work* v. *Willard*, 13 N. H. 389.

4. The Southern company, under the facts in the case, holds whatever interest it acquired in the part of the railroad in controversy, as a constructive trustee for the *bona fide* creditors of the railway company. *Gilman, Clinton and Springfield Railroad Co.* v. *Kelley et al.* 77 Ill. 426; *Michoud* v. *Gerod,* 4 How. 503; *People* v. *Township Board,* 11 Mich. 222; *F. and P. M. Ry. Co.* v. *Dewey,* 14 id. 477; *Aberdeen Ry. Co.* v. *Blackie,* 1 M'Queen R. 461; *E. and N. A. Ry. Co.* v. *Poor,* 59 id. 277; *Hoffman Steam Coal Co.* v. *Cumberland Coal and Iron Co.* 16 Md. 456; *Cumberland Coal Co.* v. *Sherman,* 30 Barb. 553.

5. A trustee or agent can not purchase the property of his *cestui que trust,* or principal; neither can he make any profit or speculation out of the business of the *cestui que trust,* or principal, for himself, or as agent for another, but whatever profit or advantage is obtained belongs to the *cestui que trust* or principal. *Ex parte Lacey,* 6 Ves. Jr. 625; *Davosee* v. *Fanning et al.* 2 Johns. Chy. 251; *Hood* v. *Warner,* 5 Paige, 655; *Diplock et al.* v. *Blackburn,* 3 Camp. 43.

6. The directors of a corporation are trustees for its stockholders and creditors, as the *cestuis que trust.* The officers are either agents or trustees, or both, according to the character of their office. But neither officers nor directors can make any private speculation or advantage out of the business of their corporation, for themselves or as agents for another, when the same would be to the injury of the corporation, its stockholders or creditors, or when such officers or directors would be placed in a position in which their interest would conflict with their duty. *Kohler* v. *Black River Falls Iron Co.* 2 Black, 715, and cases there cited.

7. The fact that the mortgage was executed by the proper officers under authority from the board of directors, and attested by the corporate seal, raises the presumption that the concurrence of the stockholders had been obtained, which can only be overcome by clear and satisfactory evidence, which the defendant failed to produce. *Zabriskie* v. *Cleveland,*

*C. and C. R. R. Co.* 23 How. 381; *Clark* v. *Imperial Gas Co.* 4 Barn. and Ald. 315; *Aurora Agl. and Hort. Society* v. *Paddock,* 80 Ill. 265; *Reed* v. *Bradley,* 17 id. 321; *Flint* v. *Clinton Co.* 12 N. H. 430; *Susquehanna Bridge and Bank Co.* v. *The General Ins. Co.* 3 Md. 305; *Burrell* v. *Nahant Bank,* 2 Metc. 166; *Adams* v. *His Creditors,* 14 La. R. 455; *Darnell* v. *Dickens,* 4 Yerger, 7; *The Bank of Vergennes* v. *Warren,* 7 Hill, 95; 1 Wharton's Law of Evidence, § 694; *Morris* v. *Keil,* 20 Minn. 531; *Berks and Dauphin Turnpike Co.* v. *Myers,* 6 Serg. and Rawle, 11; *Tinny* v. *Lumber Co.* 43 N. H. 343; *Evans* v. *Lee,* 11 Nevada, 194; *Union Gold Mining Co.* v. *The Bank,* 2 Cal. 227; *Bowen* v. *The Irish P. Con. of N. Y.* 6 Bosw. 245; *Livering* v. *The Mayor, etc.* 7 Hump. 553; *Hopkins* v. *The Gallatin T. Co.* 4 id. 403.

8.    The plea of *ultra vires* can not be interposed to prevent a recovery upon an executed contract, when the corporation has received and enjoyed a benefit from the consideration for the contract.    *Aurora Agl. and Hort. Society* v. *Paddock,* 80 Ill. 266; *Darst* v. *Gale,* 83 id. 140; *Ex parte Chippendale,* 4 D. S. M. and S. 19; *Whitney Arms Co.* v. *Barlow et al.* 63 N. Y. 62; *Bradley* v. *Ballard,* 55 Ill. 417; 2 Kent, 11 ed. p. 381, note; *Zabriskie* v. *C., C. and C. R. R. Co.* 23 How. 381; *Bissell* v. *M. S. and N. I. R. R. Co.* 22 N. Y. 258; *Cary* v. *Cleveland and Toledo R. R. Co.* 29 Barb. 35; *Parish* v. *Wheeler,* 22 N. Y. 494; *Groff* v. *Am. Lin. Th. Co.* 21 id. 124; *Argenti* v. *San Francisco,* 16 Cal. 255; *McClure* v. *Manchester and L. R.* 13 Gray, 124; *Chapman* v. *M. R. and L. R. R. Co.* 6 Ohio, 137; *Hall* v. *Mut. Fire Ins. Co.* 32 N. H. 297; *Railroad Co.* v *Howard,* 7 Wallace, 413.

Messrs. Lawrence, Campbell & Lawrence, for the appellants, in reply.

Mr. Justice Dickey delivered the opinion of the Court:

The decree in this case is not sustained by matters found in the record.

This is simply a bill by Lœwenthal to foreclose a mortgage,

and the property upon which such foreclosure is granted by the decree in this case is a section of twelve miles of a railroad, to be so taken out of the whole line of such railroad as to leave at each end of such section parts which without this section would be utterly valueless for the purposes of their construction. This section of railroad is sought to be subjected to the lien of the mortgage *as* the property of the Chicago, Danville and Vincennes Railway Company. The mortgage was given by that company to secure 500 coupon bonds of $1000 each, forty of which are held by Lœwenthal, and such mortgage embraces the entire road among other things. The bill contains no charge of fraud against those claiming liens upon or interest in this property, and seeks no other relief.

It is not claimed by appellee that the mortgagor corporation ever acquired the legal title to any of the land upon which any part of this railroad was constructed, or the right of way over any part thereof, or to any part of the money or lands alleged to have been subscribed as donations. It simply claims that that company had an equity in the right of way, and in the other donations subscribed, and it appears from the bill and the proofs that this was not an *absolute* equitable right to the property in question, but a contingent equity, depending upon conditions which were never performed, and that the mortgagor corporation is not now and never has been in a situation to enforce a right to such property or any part thereof.

Complainant now comes into a court of equity seeking relief, and to enforce these equities. This can in no event be done, unless upon the ground that the conditions upon which the equitable rights of the mortgagor depend have been performed by the Chicago and Southern Railroad Company, and in such case complainant could not be allowed to appropriate the performance by the Chicago and Southern Railroad Company without making adequate compensation for the benefit of such performance. He who seeks equity must do equity,

29—93 Ill.

and can never have relief in a court of chancery which would do injustice to others, unless it be for the enforcement of legal rights, and in many cases courts of chancery will not lend its aid to a party unless it consents to waive legal rights the enforcement of which would be unjust.

Complainant here has none but equitable rights, and these are such rights and such only as would belong to the mortgagor corporation had no assignment of the same been made or attempted after the lien of the mortgage attached.

If the Chicago, Danville and Vincennes Railway Company were complainant here, asserting an equitable right to an interest in or part of this railroad, and if it were conceded that the grading of the twelve miles of railroad in question was done by that corporation, it is plain that the utmost that it could justly claim would be an equitable interest in the *entire* railroad of which this twelve miles constitutes a part. The extent of that interest in such case could only be the value of·the grading actually done by the mortgagor company on that twelve miles. That value could be properly found only by ascertaining the entire value of the whole road, and then ascertaining what proportion of that entire value consisted of the grading done on these twelve miles in 1873. To this extent, in such case, might such interest in the road or in the fund arising from the sale of the entire road go, and no farther.

Complainant could, in no event appearing in this case, properly demand that the value of this entire road should be destroyed by cutting out twelve miles in the midst thereof and having that sold. Railroads for such purposes must be considered and treated as entireties. In this feature the decree was plainly erroneous. The whole case however, considered carefully, fails to show that complainant is entitled under this mortgage to any lien whatever upon any part of this railroad.

It is the law of this State, well settled by many decisions, that a mortgage is not assignable at law as commercial paper, although given to secure commercial paper; and that where

the *bona fide* assignee of commercial paper so secured seeks relief in equity by the foreclosure of the mortgage, the mortgagor may successfully interpose any defence which would have been available against the original payee or holder of the paper.

In this case, if these forty bonds were ever delivered by the Chicago, Danville and Vincennes Railway Company as its valid obligations, such delivery was to J. E. Young, the payee named on the bonds upon their face, or to Samuel J. Walker.

It is clearly proven that the Chicago, Danville and Vincennes Railway Company never received any consideration whatever for these bonds. This would clearly be a full defence if the bonds were still in the hands of Young, or in the hands of Walker, and either Young or Walker were complainant.

Again, the bill seeks and the decree orders not merely the sale of the interest, if any, of the Chicago, Danville and Vincennes Railway Company in the twelve miles of railroad in question, but the sale of the property in question, and by implication, holds that that twelve miles of railroad is in fact the property of that corporation. The proof shows that the Chicago and Southern Railroad Company has the legal title to most of the property, and is equitably entitled to the entire legal title.

The only title or right which the Chicago, Danville and Vincennes Railway Company ever had in any part of the line, consisted in certain contracts signed by the supposed owners of part of the land through which the road is built, promising to grant by deed to that company the right of way, fifty feet on each side of the center line, for the distance of two miles through sections eleven and thirty-five, and fifty feet on the west side of the centre line for half a mile, through the north half of section twenty-three, and for another half mile on the east side of the line, through the south half of the same section, all in the town of Lake, and in all amounting to the right of way for two miles and one-half.

These promises to so convey this small amount of right of way were however in writing, and to be performed only on certain express conditions to be performed by that corporation. These conditions that corporation never agreed to perform, and never did perform, and does not now offer to perform.

These contracts were conditioned that the Chicago, Danville and Vincennes Railway Company, among other things, should, 1st, construct a railroad from the north line of Lake township to Thornton, to be run in connection with the Chicago, Danville and Vincennes Railroad Company into Chicago, and should have finished, by the 1st of December, 1873, that portion of the line from the south line of the town of Worth to the north line of the town of Lake ready for the running of cars thereon; and 2d, should locate stations at the crossing of every section line; and 3d, should run four trains daily each way with passenger accommodations; and 4th, should issue to the grantor of the right of way and to all resident purchasers and tenants (of such grantor) of land lying upon the line, for free transportation between the station nearest to the land granted and Chicago, for the term of three years from and after the completion of the road; and 5th, should transport all passengers at as low rates as any other railroad running out of Chicago.

And such agreements, on their face, say that the grantor of the right of way, in consideration of these agreements, agreed, among other things, to convey to the corporation the right of way in question upon the final completion of the railroad through the land over which the right of way was so to be granted.

No one of these conditions is shown to have been performed by the Chicago, Danville and Vincennes Railway Company, nor is it shown that the directors of this company ever accepted or agreed to the terms of these agreements. By the proof there was a total failure of consideration. The railway company never constructed any part of this railroad;

nor did that corporation furnish any part of the materials or labor for its construction or for any part of its construction; it never located a station on the line; it never ran a train; and it never issued any passes for free transportation to any of the parties so contracting to grant the right of way, or to any of their grantees or lessees. In fact, this corporation never owned a car or had one in its possession; never bought or owned a railroad tie, a single rail of railroad iron, or had title in law or in equity to any property whatever, real or personal, or had it in its power to own any property save the contingent interest in the right of way above spoken of and a like interest in certain promises to donate money and land by certain parties, made on the same conditions stated above as to right of way. This corporation never was in a condition to demand, in law or equity, from the original promisors either the right of way or any of the donations promised of money and land. The holders of the bonds of this corporation, as the beneficiary mortgagees of all the interests of the corporation, can have no higher right than the corporation itself. Nor can the right against the grantees or assignees of these subscribers of a right of way, or donations, be greater or larger than the right against the donors themselves. It follows that the Chicago, Danville and Vincennes Railway Company have no equitable or legal title or interest in this piece of railroad. There is, hence, no interest or title in this piece of road which is subject to be sold by virtue of this mortgage.

The complainant alleges in his bill that the Chicago, Danville and Vincennes Railway Company, about the month of August, 1873, and in the fall of that year, graded the road bed of the twelve miles (subjected to sale by the decree), and during that year surveyed the line of the road from the city of Chicago to its southern terminus at Thornton. But this allegation is not supported at all by the proof.

The uncontradicted testimony in the record shows clearly that this grading was not done under the contract of Young

(made with the Chicago, Danville and Vincennes Railway Company), but was done by Brown, in the employment of the Chicago, Danville and Vincennes Railroad Company, and that Brown's work, done in 1873, was paid for by the railroad company and not by the railway company; also, that the surveying, engineering, and other incidental services relating to that grading, were done by the engineers and other employees of the railroad company and was paid for by that company. In fact, the fair inference from the proofs is, that there was never one cent paid to the Chicago, Danville and Vincennes Railway Company on the subscriptions to its stock or from any other source; that it never appointed any officers, except its directors, president, treasurer and secretary; that it never appointed or employed any general manager, or any engineer or surveyor, or laborer or agent for any purpose whatever. The obtaining of the subscriptions for donations and other aid, in the name of that company, seems to have been done by mere volunteers connected with and interested in the Chicago, Danville and Vincennes Railroad Company, without any procurement by the Chicago, Danville and Vincennes Railway Company. The fair inference from the proofs also is, that this railway company never did any acts whatever except the making of the contract with Young (which was never performed) and the ordering and causing the making of the trust deed to Fosdick and Fiske, and the preparation of the bonds described in that deed, ready for issue when it should so be ordered by that company, and that no authority or order was ever given by the directors of that company to any one to issue or deliver any of its bonds so prepared.

It would seem to be monstrously unjust to seize and take this road from the creditors of one corporation who furnished the money by which the entire construction of the road was paid for, and that without any suspicion of any adverse equities, and turn it over to the supposed creditors of another corporation in a case where neither these supposed creditors,

nor the corporation whose mortgage they hold ever paid one dollar which went into the construction of the road. It ought not to be done unless there be some iron rule of law or principle of equity which demands such result. But there is none such. As already shown, the mortgagor of the mortgage sought to be foreclosed has not and never had a consummated right or equity to the property in question; and if it were the full owner of the property, the complainant could not have a foreclosure of this mortgage, even against the mortgagor, for want of any consideration whatever by the payee or first holder of the bonds in question.

The decree of the circuit court must be reversed, and the bill is dismissed.

*Decree reversed.*