Syllabus.

The Peoria and Springfield Railroad Company

v.

S. H. Thompson.

*Filed at Springfield March 28, 1882—Rehearing denied June Term, 1882.*

1. Railroads—*constitutional prohibition against issue of bonds or stock, except for money, labor or property received.* The object of sec. 13, art. 11, of the present constitution, in providing that "no railroad corporation shall issue any stock or bonds, except for money, labor or property actually received and applied to the purposes for which such corporation was created," and that "all stocks, dividends, and other fictitious increase of the capital stock or indebtedness of such corporation shall be void," was to prevent reckless and unscrupulous speculators, under the guise or pretense of building a railroad or of accomplishing some other legitimate corporate purpose, from fraudulently issuing and putting upon the market bonds or stocks that do not, and are not intended to, represent money or property of any kind, either in possession or in expectancy, the stock or bonds in such case being entirely fictitious.

2. Same—*and herein, of the rights of innocent holders of railroad bonds.* But it was not intended by that provision to interfere with the usual and customary methods of raising funds by railroad companies, by the issue of its stocks or bonds, for the purpose of building their roads, or of accomplishing other legitimate corporate purposes. Under that provision of the constitution, railroad companies have no right to lend, give away, or sell on credit, their bonds or stock, nor have they the right to dispose of either, except for a present consideration, and for a corporate purpose. But if, upon a sale of its stocks or bonds by a railroad company for a present consideration, it should subsequently divert the proceeds to other than corporate purposes, the purchaser of such stock or bonds, who has acted in good faith in the matter, or his assignee, can not be affected by the subsequent misappropriation by the company.

3. In short, where one, for a present consideration, in good faith purchases bonds or stocks in the regular course of business from a railroad company, and such consideration is accepted by the proper officer of the company, and nothing appears to show that it is to be used or applied to other than legitimate corporate purposes, such bonds or stocks, when thus issued, will be regarded as having been issued for money, labor or property "actually received and applied," within the meaning of the constitutional provision.

4. Equitable defences—*as against a holder of negotiable paper secured by mortgage—former decisions.* It was held in *Olds* v. *Cummings*, 31 Ill. 188, that the holder of commercial paper, seeking to enforce in equity

| 103 | 187 |
| 28a | 488 |
| 103 | 187 |
| 131 | 16 |
| 103 | 187 |
| 36a | 444 |
| 103 | 187 |
| 47a | 609 |
| 103 | 187 |
| 166 | 499 |
| 166 | 587 |
| 67a | 77 |
| 103 | 187 |
| 169 | 274 |
| 103 | 187 |
| 78a | 551 |
| 103 | 187 |
| 82a | 450 |
| 103 | 187 |
| 184 | 39 |
| 103 | 187 |
| 90a | 8485 |
| 103 | 187 |
| 192 | 9168 |
| 103 | 187 |
| 195 | 4297 |
| 103 | 187 |
| 115a | 1495 |
| 115a | 8497 |

a mortgage security therefor, was subject to any defence which would have been good against the mortgage in the hands of the mortgagee himself, although such holder may have purchased the paper in good faith, and before its maturity.

5.   But this doctrine has no application to deeds of trust given to secure railroad coupon bonds intended to be thrown upon the market and circulated as commercial paper, and to be used as securities for permanent investments.

6.   So where·such railroad bonds, secured by deed of trust for the benefit of the holders thereof, had been issued, and delivered to contractors engaged in the construction of the road, and by them disposed of in the market to innocent purchasers, on bill by the trustee to foreclose the deed of trust for . the benefit of the bondholders, it was *held*, the unsettled equities and matters of account between the company and the contractors could not be interposed in defence against the bill.

7.   A part of the reasoning of the court in *Chicago, Danville and Vincennes Ry. Co.* v. *Loewenthal,* 93 Ill. 433, is not to be reconciled with the rule here announced. But what appears in the opinion relating to the question here mentioned was said *in arguendo,* and after the case had been decided upon another distinct ground, and without any argument of the question except upon one side. Under these circumstances, it is considered that what was there said ought not to be, and is not, regarded as conclusive of the question, and the court is satisfied the view now presented is the correct one.

8.   Corporations—*acts ultra vires—estoppel.*  While it is the general principle that negotiable securities issued by a corporation without authority of law, or in express violation of a statute, are inoperative and void even in the hands of innocent holders, yet there is another rule of law equally well settled—that although a contract entered into by the agents or officers of a private corporation is *ultra vires,* and therefore not binding on the company so long as it remains executory, yet if the company in such case knowingly permits the other contracting party, without objection, to go on and perform the contract on his part, and thereby obtains and appropriates to its own use money, property or labor in furtherance of some legitimate corporate purpose, it will be estopped from denying its liability on such contract.

9.   Redemption—*of railroad property sold on foreclosure.*  Where a railroad, its appurtenances and franchises, are mortgaged as a whole, there is no power or authority to sell them separately, and such property, taken as a whole, not being, strictly speaking, either real or personal estate, when sold on a decree of foreclosure is properly sold without any right of redemption. The rule is founded partly upon considerations of public policy.

Appeal from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Peoria county; the Hon. D. McCulloch, Judge, presiding.

The Peoria and Springfield Railroad Company, a corporation duly organized under the laws of this State, on the 31st day of October, 1871, entered into a written contract with B. S. Prettyman, D. T. Thompson, Thos. Edes, A. J. Ware, B. E. Smith, C. R. Griggs and W. Dennison, by which the latter covenanted and agreed to furnish the materials, build and complete in a good, workmanlike manner, a single track railway, with necessary sidings and passing places, from the city of Peoria, in Peoria county, via the city of Pekin, in Tazewell county, to the city of Springfield, in Sangamon county, this State, in consideration of which, among other things, the railroad company agreed to pay the above named contractors the sum of $20,000 per mile in first mortgage seven per cent bonds of the company, which were to be made the first "and exclusive lien on said railroad, its franchises, property and equipments of every kind." Said bonds, or so many of them as might be required, were to be delivered by the company to the contractors, or their agents, at any time, on demand, to be used by them "to pay for iron, materials or labor for the construction of said road, or to be sold for money," upon satisfactory evidence being produced that the materials were purchased for the use of the road, or the work and labor were done according to the terms of the contract. The company also agreed to pay the contractors in the paid up capital stock of the company the additional sum of $12,-000 per mile for said railway, to be issued whenever required for the construction of the road.

Subsequent to this contract, and before the 13th of February, 1872, by some arrangement between the contracting parties, Edes and Prettyman withdrew from the undertaking, and Smith, Griggs, Dennison, Ware and Thompson, the remaining contractors, assumed the performance of the contract with the railroad company. Upon this change in the parties to the enterprise, it was agreed that the business should thereafter be conducted under the name and style of

Thompson, Griggs & Co.; that Ware and Thompson should receive nothing for their services, and that Smith, Griggs and Dennison should furnish the money, and that Smith alone should have exclusive charge of the financial matters of the company. This arrangement seems to have been acquiesced in by appellant, for on the day last mentioned a supplementary agreement was entered into between the railroad company and the members of the firm of Thompson, Griggs & Co., in which the making of the former agreement is recited, and by the terms of which the contractors bound themselves to furnish the necessary material and build a bridge, of a specified character, on the line of the company's road across the Illinois river, for which the company agreed to pay them in said first mortgage bonds, at par value, the additional sum of $200,000.

In pursuance of these contracts, on the 11th of April following, the railroad company, through its board of directors, adopted certain resolutions, wherein it ordered and directed "that a series of one thousand five hundred of the company's bonds, each for the sum of $1000, to be numbered consecutively from one to fifteen hundred, inclusive, be prepared for issue and delivery, signed by the president and secretary, the corporate seal of the company to be affixed thereto, and authenticated, when so signed and sealed, by the certificate of a trustee, bearing date the first day of April, 1872, and payable to I. E. Leonard, or bearer, in the city of New York, at such place therein as such company shall from time to time appoint, on the first day of April, * * * 1902, with interest warrants thereto attached, signed by the secretary, for the payment of interest thereon, at the rate of seven per cent per annum, free from government tax, payable at the same place on the successive days of October and April of each year, both the principal and interest of such bonds to be payable in gold." It was further ordered and directed in and by said resolutions, that a deed of trust be prepared

and executed by the president and secretary of the com-
pany conveying the road of the company, its appurtenances,
appendages, franchises, equipments, tolls, income, assets and
property, then possessed or thereafter acquired, to William
A. Dennison, trustee, to secure the payment of said bonds
and interest warrants.

The bonds and trust deed were prepared and duly executed
in conformity with the directions of the company as expressed
in the above resolutions, as of the date of April the 1st, 1872.
The bonds, when so executed by the company, were sent to
Smith, at Columbus, Ohio, for the purpose of having them
certified by Dennison, as in the trust deed provided. Six
hundred of these bonds were, on presentation, accordingly
certified by Dennison, and left by him with Smith in the
latter's office, in Columbus, Ohio, where Dennison and Smith
both resided, and where the latter kept his office. The
remaining nine hundred bonds were never so certified or used
for any purpose.

About the time of the preparation of these bonds and the
trust deed, or perhaps a short time before, Thompson, Griggs
& Co. commenced active operations in the building and con-
struction of the road and bridge, under the contracts above·
mentioned, and so continued until in January, 1873, when
the work was suspended, and has never since been resumed.
Before the abandonment of the work the contractors had
already completed the bridge, and substantially finished as
much of the road as lies between Peoria and Pekin, a dis-
tance of twelve miles. On the 8th of April following the sus-
pension of the work in January, the railroad company leased
the completed portion of its road lying between Pekin and
Peoria to the Indianapolis, Bloomington and Western Rail-
way Company, for ninety-nine years from the 1st day of
February, 1873, with a covenant of renewal forever, at an
annual rental of $50,000, a part of which was to be applied
by the lessee to the payment of the semi-annual interest on

six hundred of the above mentioned bonds, and the balance of the rental to be paid to the railroad company. Upon the execution of this lease a certificate was endorsed upon the six hundred bonds above mentioned, showing the payment of the interest was assumed by the Indianapolis, Bloomington and Western Railway Company. Five hundred and ninety of these bonds being thus executed by the company, certified by the trustee, and the interest assumed by the lessee of the road, in the manner stated, were from time to time negotiated and transferred, in the regular course of business, by Thompson, Griggs & Co., and have passed into the hands of the present holders for value, without notice of any supposed infirmity in them, being the same bonds now in controversy. The remaining ten of the six hundred, after having been used for some time as collateral security, have since been brought into court and surrendered up, and are therefore eliminated from the present controversy.

The trust deed above mentioned expressly provided that in case the company should, for the term of six months, make default in the payment of the interest on its bonds, the principal should also become due and payable at the option of the holders of the bonds. Default having been made in the payment of the interest on a part of these bonds, Samuel H. Thompson, on the 22d of May, 1875, filed in the Peoria county circuit court the original bill in this case, against the railroad company, Dennison, the trustee, and various other parties in interest, alleging that he was owner of five of the bonds in question; that default had been made in payment of the interest thereon for more than six months; that the company had become insolvent; that its property was depreciating, and that it had ceased to apply the earnings of the road to the payment of the interest on its bonded indebtedness, whereby the complainant and other bondholders were in danger of losing their claims, etc., and prayed a foreclosure of the deed of trust, and that a receiver might be

appointed to take immediate charge of the road and assets of the company. Upon the filing of this bill, the court, on the same day, appointed James Haines receiver, who thereupon qualified, and entered upon the duties of his appointment.

Dennison, the trustee, on the 2d of January, 1877, filed an answer and also a cross-bill, setting up the making of the bonds and trust deed, as heretofore stated; the leasing of the road to the Indianapolis, Bloomington and Western Railway Company; the insolvency of the latter company; the default in payment of interest on all the bonds; the insolvency of the Peoria and Springfield Railroad Company, and the sale and transfer by it of the six hundred bonds in question about the time of their date, and prayed for a foreclosure of the trust deed.

The company, by its answers to the original bill and cross-bill of Dennison, admits the making of the trust deed and bonds by the company, but denies they were ever negotiated or delivered by it. It at the same time filed a cross-bill, in which the same facts are reiterated. It is also charged in the cross-bill that Thompson, Griggs & Co. entered into a conspiracy to wrongfully and fraudulently appropriate the bonds in controversy to themselves; that they have failed to perform their contract with the company for the building of the road, and procuring the right of way, by reason of which, it is claimed, the company has sustained large damages, which it asks to be recouped or set off against the claims sought to be enforced against the road.

Numerous other pleadings were filed and orders entered in the cause, whereby the issues were finally made up, which are not necessary to be particularly noticed in order to a proper understanding of the case.

Dennison having resigned as trustee pending the suit, William F. Bryan was appointed trustee in his stead, who filed a supplemental cross-bill on behalf of the bondholders. The circuit court found the equities with the bondholders as

13—103 Ill.

against the company, ascertained the amount of its indebtedness, and ordered the same paid within a specified time, and in default of such payment ordered a sale of the mortgaged property, and directed the proceeds, after the payment of the expenses of the trust, including costs and certain preferred claims against the company specified in the decree, to be applied to the payment of its bonded indebtedness, and the residue, if any, after the payment of all claims, to be paid over to the company. From this decree the company appealed to the Appellate Court for the Second District, where the same was affirmed, and the cause is brought here by further appeal from the Appellate Court.

Such facts not appearing in the foregoing statement as are necessary to an understanding of the controverted questions in the case, sufficiently appear in the opinion of the court.

Messrs. Prettyman & Hughes, for the appellant:

The bonds in question are void, the company, under the constitution and law, having no power to issue them except for "money, labor or property actually received and applied to the purpose for which the corporation was created." Const. 1870, art. 11, sec. 13; Rev. Stat. 1874, chap. 114, sec. 22.

When the legislature prohibits an act, or declares it shall be unlawful to do it, the courts must hold such act void. *Mutual Ins. Co.* v. *Rosenthal*, 55 Ill. 91; *Munsell* v. *Trumble*, 3 Gilm. 93; *People* v. *Chicago*, 51 Ill. 34; *Bank* v. *Owens*, 2 Pet. 527; *Bester et al.* v. *Wathen et al.* 60 Ill. 138; *Linder* v. *Carpenter*, 62 id. 309; *St. Louis, Jacksonville and Chicago R. R. Co.* v. *Mather*, 71 id. 592; *Wheeler* v. *Russell*, 17 Mass. 281; *Insurance Co.* v. *Kipp*, 8 Cow. 20; *White* v. *F. Bank*, 22 Pick. 184; *Bailey* v. *Tabor*, 5 Mass. 292; *Mitchell* v. *Smith*, 1 Binn. 110.

When the constitution forbids issuing such bonds without such payment, they can have, when so issued, no more validity than the bonds of a county issued without an election. *Law*

v. *People,* 87 Ill. 385; *Fuller* v. *Chicago,* 89 id. 282; *County of Hardin* v. *McFarlin,* 82 id. 138; *Jackson County* v. *Bush,* 77 id. 66; *Town of Elmwood* v. *Marcy,* 2 Otto, 289; *Aspinwall County* v. *Davis,* 22 How. 365; *Concord* v. *State Bank,* 92 U. S. 625; *Greencastle* v. *Black,* 5 Ind. 569; *Lockport* v. *Gaylord,* 61 Ill. 276; *Hills* v. *Chicago,* 60 id. 91; *Chance* v. *Marion County,* 64 id. 66; *Buchanan* v. *Litchfield,* 12 Otto, 292; *Town of Pana* v. *Lloyd,* 97 Ill. 191; *Force* v. *Town of Batavia,* 61 id. 100; *Williams* v. *Roberts,* 88 id. 13; *Lippincott* v. *Pana,* 92 id. 34; *Marshall County* v. *Cook,* 38 id. 48; *Lewis* v. *Shreveport,* 3 Wood, 213.

A *bona fide* holder is not protected when the maker has no power to make or issue such paper. Such bonds have not the quality of commercial paper. The law is notice of the want of power to issue. *Marsh* v. *Fulton County,* 10 Wall. 676; *Loan Association* v. *Topeka,* 20 id. 655; *Town of Elmwood* v. *Marcy,* 92 U. S. 289; *Town of Oakland* v. *Skinner,* 94 id. 258; *Town of Ottawa* v. *Perkins,* 94 id. 260; *McClure* v. *Oxford,* 94 id. 429; *Antony* v. *Jasper County,* 101 id. 101; *Wadsworth* v. *Eu Clare County,* 102 id. 536; *Aspinwall* v. *Comrs. D. Co.* 22 How. 364; *Lewis* v. *Barber County,* 3 Fed. Rep. 191; *Chisholm* v. *County of Montgomery,* 2 Wood, 595; *M. S. I. and T. Co.* v. *Goodrich,* 75 Ill. 559; *Gadis* v. *Richland County,* 92 id. 120; *Marsh* v. *Fairbury, Pontiac and Northwestern R. R. Co.* 64 id. 414; *Bates County* v. *Winters,* 97 U. S. 91; *Railway Co.* v. *Allison,* 18 Wall. 233; *Willis* v. *Supervisors,* 12 Otto, 625.

The original payee of bonds secured by mortgage or deed of trust holds the same subject to all defences in equity, and his assignee, or the subsequent holder, takes, in equity, subject to the same defences. *Olds* v. *Cummings,* 31 Ill. 188; *Haskell* v. *Brown,* 65 id. 29; *Thompson* v. *Shoemaker,* 68 id. 256; *Bryant* v. *Vix,* 83 id. 14; *Sargent* v. *Howe,* 21 id. 148; *Kleeman* v. *Frisby,* 63 id. 482; *Chicago, Danville and Vincennes R. R. Co.* v. *Loewenthal,* 93 id. 433; *Pettilon* v. *Noble,*

73 id. 567; *Foster* v. *King*, 5 Bradw. 223; *Belohradsky* v. *Kuhn*, 69 Ill. 547.

The court erred in ordering a sale of the entire road, with tools, accounts, claims and personal assets, without redemption. The right to redeem real estate sold on decree of foreclosure is a statutory right, and can not be taken away by decree. *Palmer* v. *Forbes*, 23 Ill. 301; *Tytus* v. *Mabee*, 25 id. 257; *Fisher* v. *Palmer*, 50 id. 226; *Wolf* v. *Hogan*, 24 id. 525; *Warner* v. *D. C. N. Bank*, 4 Bradw. 305; *Karnes* v. *Lloyd*, 52 Ill. 116.

Mr. H. B. Hopkins, and Mr. John B. Cohrs, for the appellee:

The bonds in question are no infraction of sec. 13, art. 11, of the constitution, as they represent no 'fictitious indebtedness. The entire road was built from the proceeds of these bonds. But the company, by securing and applying to its use the proceeds of the bonds, is estopped from making the objection that they were issued in violation of the constitution. *Aurora Agricultural and Horticultural Society* v. *Paddock*, 80 Ill. 266; *Whiting Arms Co.* v. *Barlow*, 63 N. Y. 62; *Zabrieski* v. *C. C. and C. R. R. Co.* 23 How. 381; 2 Kent's Com. (11th ed.) 381, note; *Darst* v. *Gale*, 83 Ill. 136; *Bradley* v. *Ballard*, 55 id. 413; *West et al.* v. *Madison County Agricultural Board*, 82 id. 205; *Chicago Building Society* v. *Crowell*, 65 id. 453; *McCarthy* v. *Lavasche*, 89 id. 270; *Bissell* v. *M. S. and N. I. R. R. Co.* 22 N. Y. 258; *Argenti* v. *San Francisco*, 16 Cal. 255; *McClure* v. *Manchester and L. R. R. Co.* 13 Gray, 124.

We maintain that the bonds are not affected by equities, if any exist, between the Peoria and Springfield Railroad Company and the firm of Thompson, Griggs & Co. The rule on this point adopted in this State is opposed to the settled doctrine of the other courts of the country generally, including both State and Federal courts. 1 Daniell on Negotiable Inst. secs. 834–836; 2 Jones on Mortgages, secs. 1485–1487, sec.

834, note 1; *Carpenter* v. *Logan,* 16 Wall. 271; *Endicott* v. *Supervisors,* 16 id. 458; *Taylor* v. *Perry,* 6 Allen, 86; *Pierce* v. *Force,* 47 Me. 507; *Reeves* v. *Smiley,* Walker's Ch. 248; *Bloomer* v. *Henderson,* 8 Mich. 395; *Fisher* v. *Otis,* 3 Chand. 83; *Martin* v. *McCullom,* 4 id. 153; *Croft* v. *Brewster,* 9 Wis. 503; *Cornell* v. *Hutchins,* 11 id. 353.

The bonds being made payable to the holder, and transferable by delivery, the company has contracted itself out of its right to set up equities. *Higgs* v. *A. T. Co.* (Law R.) 4 Exch. 387; *In re Blakesly,* id. 3 Ch. 154; Green's Brice on Ultra Vires, 163–167; *McElrath* v. *P. and S. R. R. Co.* 55 Pa. St. 206; *Sappington* v. *Pulliam,* 3 Scam. 385; *Cranch* v. *Credit Foncier,* 6 Eng. 117; *Rumbel* v. *Metropolitan Bank,* 20 id. 276; *Moore* v. *Met.* 55 N. Y. 41; *Johnson* v. *Stark County,* 24 Ill. 75; *City of Pekin* v. *Reynolds,* 31 id. 529; *Jones* v. *Nellis,* 41 id. 482; *Garvin* v. *Wiswell,* 83 id. 218; *Smith* v. *Johnson,* Breese, 18; *Town of Eagle* v. *Cohn,* 84 Ill. 218.

There was no error in the decree touching redemption of the mortgaged property. There is no statute authorizing redemption of the class of property in question. The mortgaged property, in its integrity as a unit, is made up of three inseparable constituent parts: First, intangible personal property, such as franchises, charter rights, right to levy tolls, etc.; second, tangible personal property, embracing rolling stock and all other movable property, incomes, profits, tolls, contracts, good will, etc.; third, qualified interest in lands, being an easement or right of way.

Mr. Justice Mulkey delivered the opinion of the Court:

Some of the questions presented by this record are of unusual interest, and have been discussed by counsel on both sides with marked ability; and after a careful consideration of all that has been urged both *pro* and *con*, and a laborious and patient examination of the vast amount of testimony which has been taken in the cause, with a view of

obtaining an accurate knowledge of the material facts upon which the controversy depends, it remains for us to present our own conclusions upon the more important of these questions, together with some of the considerations which have led to the results reached.

Perhaps the most important of all the questions presented for our determination is the one first discussed in appellant's brief. It is earnestly insisted that the bonds in question are absolutely void, on the ground they were issued and put in circulation in contravention of section 13 of article 11. of the present constitution, and also of section 22, chapter 114, Revised Statutes. The section of the constitution relied on provides, that "no railroad corporation shall issue any stock or bonds except for money, labor or property actually received and applied to the purposes for which such corporation was created; and all stocks, dividends, and other fictitious increase of the capital stock or indebtedness of any such corporation, shall be void." The section of the statute cited is almost a literal copy of the above provision of the constitution.

It is claimed that the evidence shows that the bonds in question, after having been prepared and executed by the company, were placed in the hands of Smith for the purpose of having them certified by Dennison, the trustee, as required by the provisions of the trust deed, and when thus certified to be returned to the company, and for no other purpose, and that the subsequent appropriation of them by Thompson, Griggs & Co. was without any warrant or authority from the company, but that, conceding the company's officers and agents assented to such appropriation, it affirmatively appears that the bonds, at the time of their delivery to them, were not given for either money, labor or property which had theretofore been actually received or applied to the purposes for which the company was created, wherefore it is concluded that the bonds are absolutely void, even in the hands of innocent holders.

Assuming, for the purposes of the argument, the facts to be as claimed by appellant's counsel, is the construction which they place upon this provision of the constitution the true one? It could hardly have been the intention of the framers of the constitution by this provision to prohibit the building of railroads altogether with means to be realized from the sale of bonds and stocks, and yet such would undoubtedly be its practical effect if the construction contended for is correct, for it is hardly reasonable to suppose that capitalists would advance money to build a railway upon the mere promise of the company at some future day, after the completion of the road, to issue bonds or stock for the money thus advanced. Nor is it at all probable, on the other hand, that promoters of railroad enterprises would undertake to build railways without present means to defray current expenses. This could not be done. Laborers, mechanics and material-men have to be paid in ready money, and this must be raised either by negotiating the bonds or stock of the company at the outset, or the contractors or promoters must advance it out of their own pockets, upon the faith of the company's being able, at some future day, to negotiate its bonds for the purpose of reimbursing them. This course would be so hazardous that no one would be safe in adopting it, and few, if any, prudent business men would be likely to do so. The negotiation of railway bonds depends so much upon the temper of the times and the state of the money market when they are offered, that none but men of unlimited means could safely commence the construction of a railroad under such circumstances. Men of moderate means, relying upon such resources, would, in cases of this kind, be exposed to the danger of being forced to abandon the enterprise altogether, after having exhausted their own private funds in the prosecution of the work, by reason of being unable to negotiate bonds for the work actually done.

Every railway company, when first organized, has neither money nor property of any description, outside of its stock, with which to build its road, hence, if it builds it at all, it must of necessity build it on a credit, unless it is built exclusively out of the proceeds of its stock; but even this could not be done under the construction contended for, because if that be the true construction, the company would be as powerless to negotiate its stock in advance of the work actually performed as it would its bonds. Both stock and bonds, it will be perceived, stand upon the same footing in this respect. Uniform experience shows that public and private interests alike demand that in the building of a railroad the means for that purpose should be fully and definitely provided before the commencement of the work, and this is especially necessary when the sale of the company's bonds or stock is relied on for that purpose, which, we may add, is almost universally the case.

But it is quite manifest that means to build a railway could not be thus raised in advance if the position of appellant is correct. Upon the hypothesis the construction in question is the proper one, the result would be this: Every share of stock and every bond issued by a railroad company in this State since the adoption of the constitution, is absolutely void in the hands even of an innocent holder, unless the same was issued in satisfaction of an existing liability of the company on account of money, labor or property previously received and applied to some corporate purpose. It is difficult, if not impossible, to fully estimate the consequences of such a holding. It is a matter of general notoriety, within the range of every man's knowledge of ordinary information, that a large proportion of the railroad bonds that are now upon the market in the hands of innocent holders, whose proceeds have been applied in establishing and building up the magnificent railway system in our State, were originally issued and sold upon the market before any con-

siderable amount of money, labor or property was expended
in building the roads, or for other corporate purpose, and
yet, if the construction contended for is to prevail, it would
defeat all these bonds.  Who has ever supposed that a dealer
in railroad stocks, by virtue of the provision in question, can
not with safety buy a single share of stock in any of the rail-
road companies of the State without first ascertaining and
satisfying himself it was originally issued by the company in
discharge of some existing liability on account of money,
property or labor having been previously received and actu-
ally applied by the company to some corporate purpose?
And yet such precaution would be necessary under the rule
insisted on.

The very statement of the proposition affords ample evi-
dence that such could not have been the intention of the
framers of the constitution.   The latter part of the clause of
the constitution in question, which declares that "all stocks,
dividends and other fictitious increase of the capital stock or
indebtedness of such corporation shall be void," we think
clearly points out the chief object which the constitutional
convention sought to accomplish in adopting it, and to this
we must look, in a large degree, for a solution of the language
which precedes it.   The object was doubtless to prevent reck-
less and unscrupulous speculators, under the guise or pre-
tense of building a railroad, or of accomplishing some other
legitimate corporate purpose, from fraudulently issuing and
putting upon the market bonds or stocks that do not and are
not intended to represent money or property of any kind,
either in possession or expectancy, the stock or bonds in
such case being entirely fictitious.

We can not believe it was intended by the provision in
question to interfere with the usual and customary methods
of raising funds by railroad companies for the purpose of
building their roads, or of accomplishing other legitimate
corporate purposes.   To hold that such a company can not,

in good faith, issue its stocks or bonds for ready money to build its road, or to effectuate other lawful objects, is, in effect, to deprive it of the only means it possesses of carrying into effect the purposes of its creation. Under this provision of the constitution, railroad companies have no right to lend, give away, or sell on credit, their bonds or stock, nor have they the right to dispose of either, except for a present consideration, and for a corporate purpose. But in such case, if the company should subsequently divert the proceeds to other than corporate purposes, the purchaser of such stock or bonds, who has acted in good faith in the matter, can not be affected by the subsequent misappropriation by the company. To hold him or his assignee responsible for the application of the proceeds, would be to effectually destroy the usefulness and value of such securities. In short, we are of opinion that when one, for a present consideration, in good faith purchases bonds or stocks in the regular course of business from a railroad company, and such consideration is accepted by the proper officer of the company, and nothing appears to show that it is to be used or applied to other than legitimate corporate purposes, such bonds or stocks, when thus issued, will be regarded as having been issued for money, labor or property (as the case may be) "actually received and applied," within the meaning of the constitutional provision in question. Any other construction would lead to consequences of the most serious character, which could not have been intended by the framers of the constitution.

We do not at all question the general principle contended for by appellant's counsel, that negotiable securities issued without authority of law, or in express violation of a statute, are inoperative and void in the hands of even innocent holders; yet there is another rule of law equally well settled, namely, that although a contract entered into by the agents or officers of a private corporation is *ultra vires*, and therefore

not binding on the company so long as it remains executory, yet if the company in such case knowingly permits the other contracting party, without objection, to go on and perform the contract on his part, and thereby obtains and appropriates to its own use money, property or labor in furtherance of some legitimate corporate purpose, it will be estopped from denying its liability on such contract. *Bradley* v. *Ballard,* 55 Ill. 413; *Chicago Building Society* v. *Crowell,* 65 id. 453; *City of East St. Louis* v. *East St. Louis Gas Light and Coke Co.* 98 id. 415; *Darst* v. *Gale,* 83 id. 140.

The claim of appellant that the fifteen hundred bonds were simply sent to Smith for the purpose of having them certified by Dennison, and at once returned to the company, and that it was intended they should all be so certified and returned at the same time, and that Dennison had no right to certify six hundred of them and not the others, and that this was done without the knowledge or consent of the company, is inconsistent with the uncontroverted facts in this case. The claim, also, that the company was ignorant of the fact that these six hundred certified bonds were being used by Thompson, Griggs & Co., during the year 1873, after the interest had been guaranteed by the Indianapolis, Bloomington and Western Railway Company, is also inconsistent with admitted facts. The undisputed fact is, that more than a year after these bonds had been delivered to Smith, a member and the financial agent of the firm of Thompson, Griggs & Co., and after the work on the road had been entirely suspended, the company executed a perpetual lease of the completed portion of the road lying between Pekin and Peoria, to the Indianapolis, Bloomington and Western Railway Company, in which the latter company, as a part of the consideration of the lease, expressly undertook the payment of the interest on the six hundred bonds in question.

If these bonds were not regarded by the company as standing on a different footing from the remaining nine hundred

not certified by Dennison, how did it happen that the interest on them was provided for, and not on the others? No one connected with the railroad company could have been ignorant of the fact that Thompson, Griggs & Co. had already at that time expended of their own means in procuring the right of way, building the bridge and so much of the road as was then completed, an amount nearly, if not quite, equal to the full value of these bonds, and that they were then in the hands of that firm, and in justice belonged to them, even if there had never been any formal delivery of them. Under these circumstances we can not but regard the provision in the lease by which the lessee assumed the payment of the interest, as an official recognition on the part of the company of the fact that these bonds then represented an outstanding indebtedness against it. This being so, would it not be wholly inconsistent with every conception of equity to permit the company to now come into court and defeat a recovery on them, on the ground that there are some unadjusted equities between it and Thompson, Griggs & Co., or that there was never any formal delivery of them to that firm?

The fact is patent and uncontroverted that the road, including the bridge, was built, so far as it was built at all, exclusively with means advanced by Thompson, Griggs & Co., which are represented by the bonds now in suit. If the railroad company succeeds in defeating a recovery on the bonds, what is the result? Thompson, Griggs & Co. will have no claim upon the road, for they have already reimbursed themselves by a sale of the bonds to the present holders, and if the latter can not recover there can be no recovery at all, and the consequence is, the railroad company finds itself the absolute owner of an unincumbered railway, supposed to be worth about $50,000 a year, which has cost it comparatively nothing, while the bondholders, who ultimately furnished the money that built it, are turned out of court without a cent. If such is to be the result, it is certainly a

piece of model financiering on the part of the company, if we leave out of view the manifest injustice of the thing.

The company insists that it has sustained large damages by reason of the contractors' failure to complete the road to Springfield, and from other breaches of the construction contract, and it is earnestly contended, that even admitting these bonds were delivered by the company to Thompson, Griggs & Co., as claimed by appellee, still, under the rule of *Olds* v. *Cummings*, 31 Ill. 188, the holders of the bonds, so far as the deed of trust is concerned, took them subject to all equities the company may have against the contractors. The rule in that case rests, at least in part, on technical grounds, which have lost much of their force in more recent times by reason of the manifest tendency of judicial thought to an equitable standard, and while it is not intended to question the authority of that case, yet, for the reasons suggested, we do not think the principle should be extended to cases that are not clearly shown to be within the rule there announced. In the case of an ordinary mortgage or deed of trust to secure a temporary loan from one individual to another, the note or evidence of the indebtedness taken at the time, although it may be negotiable, is not given for the express purpose of being put upon the market and used as a permanent investment of capital, as in the case of railroad securities, nor does the mortgagee in such case, as a general rule, rely wholly on the security which the mortgage affords, as is always done in the case of railroad mortgage bonds.

In ordinary cases of the kind suggested, the mortgage is uniformly made for the benefit of some one specifically mentioned (usually the payee of the note), and the legal interest in such note is by operation of law vested in him, and can only be transferred to another by his indorsement, and the mortgage passes in equity, as an incident of the debt, by virtue of such indorsement. The case before us is unlike the ordinary one suggested, in several essential particulars. The

bonds in question are not payable to Thompson, Griggs & Co., nor is the trust deed, so far as anything appears on the face of it, made to them or for their benefit. Indeed, they are not so much as mentioned either in the bonds or the trust deed. On the contrary, the bonds are in express terms made payable to "the holder" of the bonds, and the deed of trust is expressly declared to be "*for the benefit, protection and security of the persons or corporations who shall hold the bonds about to be assured,*" etc. Thus it clearly appears that, so far as the record shows, Thompson, Griggs. & Co. were total strangers to the transaction, and upon what principle any equities the company may have against them can be interposed so as to defeat the title of the present holders, is not perceived. It clearly can not be done. In short, we hold the doctrine of *Olds* v. *Cummings* has no application to deeds of trust given to secure railroad coupon bonds intended to be thrown upon the market and circulated as commercial paper, and to be used as securities for permanent investments. To hold otherwise would be doing violence to the manifest intention of the parties to such instruments, and would unquestionably lead to very disastrous consequences. It is true that a part of the reasoning by which our conclusion upon this question is reached in the present case, applies to some of the cases following *Olds* v. *Cummings*, but a review of those cases will clearly show that the present case may be distinguished from all of them in this, that both the deed of trust and the bonds, as we have already seen, show expressly upon their face that they were executed for the benefit of the holders of the bonds, whoever they might be.

The case of *Chicago, Danville and Vincennes Ry. Co.* v. *Loewenthal*, 93 Ill. 433, is cited as announcing a different view from that here presented. It is true that a part of the reasoning of the court in that case is not to be reconciled with what we have here said. It is sufficient, however, to say, with reference to that case, that what appears in the

opinion relating to this question was said *in arguendo*, and after the case had been decided upon another distinct ground, and without any argument of the question except upon one side. Under these circumstances, what was there said ought not to be, and is not, regarded as conclusive of the question, and upon more mature consideration of the subject we are fully satisfied the view now presented is the correct one.

The conclusions reached upon the questions already discussed render it unnecessary to consider the state of accounts between appellant and Thompson, Griggs & Co. Whether, upon a fair adjustment of their claims, there is anything due either way, is a matter in which the bondholders have no concern, since they can not be affected, as we have already seen, by any equities between them. For the same reason it is also unnecessary to consider other matters discussed by counsel in their briefs.

The decree orders a sale of the whole of the mortgaged property, both real and personal, tangible and intangible, absolutely and without redemption, and in this it is claimed there is error. This question is one of unusual importance and interest, and while it has frequently arisen in and been passed upon by the Federal courts of this State, yet, so far as we are advised, it has never before been directly presented to this court.

The right of redemption in any case is purely statutory, and whoever claims such right is bound to bring himself clearly within the provisions of the statute. The act of 1845 relating to this subject was in force at the time of the execution of the trust deed, and the rights of the parties, so far as this question is concerned, must be controlled by it. By the 15th section of chapter 57, of the Revised Statutes of 1845, it is provided, that when lands and tenements shall be sold on judgments at law, the defendants or others interested may, "within twelve months of such sale, redeem such lands or tenements by paying," etc., and by the 24th sec-

tion of the same chapter it is further provided, that "when lands shall be sold under and by virtue of any decree of a court of equity for the sale of mortgaged lands, it shall be lawful for the defendant or parties in interest to redeem the same in the manner prescribed for redemption of lands sold under judgments at law."

While it can not be seriously questioned that a railway track, considered without regard to its public character and the franchises usually connected with it, is "lands," or "lands and tenements," within the meaning of the above sections, yet the question here presented is, is a railway, its appurtenances and franchises, when legally mortgaged and ordered to be sold as an entirety, under a decree of foreclosure, lands or tenements, within the meaning of those sections? A number of reasons suggest themselves to us why they should not be so considered. In the first place, when a railway, its appurtenances, privileges and franchises are mortgaged as a whole, there is, in our opinion, no power or authority to sell them separately. From the very nature of the property one would be useless without the other. The franchise could not be used at all without the road, and the road could not lawfully be used, as against the State, without the franchise. Under such circumstances, to avoid the possibility of conflicting ownerships, the law has wisely determined that both must be sold as an entirety. *Chicago, Danville and Vincennes Ry. Co.* v. *Loewenthal, supra.*

While the franchise to construct and operate a railway is generally regarded as a grant of a part of the sovereign power of the State, partaking of the nature of a *quasi* public trust, yet it is also treated, particularly at the present time, as a species of intangible personal property, and by the 34th section of the Revenue act it is expressly required to be listed as such for the purposes of taxation. Now, while a railroad franchise, when considered by itself, will be treated as personal property, and the road itself, when so viewed,

will be treated as realty, yet when considered as an entirety, as they must be when so mortgaged and sold, they are, strictly speaking, neither the one nor the other, within the meaning of the law pertaining to redemptions. From a sale of land a redemption is allowed,—from a sale of personal property no such redemption is permitted; and since the two are indissolubly combined, by virtue of the mortgage, decree and sale, there is just as much reason, so far as the question depends upon the two kinds of property when separately considered, for contending the right of redemption is denied, as there is that it is given. And since it devolves on the party alleging such right to show a clear case within the statute, it follows that under the circumstances stated there would be no right of redemption.

But there are other considerations bearing on this question that should not be overlooked. In view of the public character of the road, it will not be questioned that the public generally have a direct interest in keeping it continuously open, without any material diminution of its capacity, to meet all the legitimate wants of the public. It is, therefore, but just and proper that the foreclosure proceedings should be conducted in such a manner, having due regard to the private interests of all parties concerned, as to cause the least possible injury or inconvenience to the public, and we are of opinion this will be more effectually accomplished by the method adopted than it can be in any other way. To have ordered a sale of the personal property separately, from which it is conceded there would be no redemption, and a sale of the realty with the right of redemption, as is claimed should have been done, it would most likely have resulted either in a sacrifice of the property, or some portion of it, or in embarrassing complications seriously affecting, at least for a while, the public interests. Moreover, it is difficult for us to believe that the wrecking of the property of a railroad company, and selling it out by piecemeal, would in any case

14—103 Ill.

be for the best interests either of the public or those having an interest in its assets. It is also equally difficult for us to see how any one would be likely to pay anything like the present value of the property of a railroad company, even when sold as an entirety, where the right of redemption is reserved. However necessary, the purchaser in such case would not be safe in making anything like expensive repairs, or in increasing the carrying capacity of the road to meet the demands of business and travel, until after the time of redemption had expired. Besides, being out of possession during the fifteen months allowed to redeem, he would have no right even to make such repairs and improvements without the consent of those having the road in charge, and it is quite reasonable to assume if the railroad company saw it could not redeem, or if it had no intention of redeeming, it would make no such repairs, and the public might thereby suffer great inconvenience, and the road be seriously injured. But as before stated, this question has frequently been before the Federal courts in this State, and so far as we are advised. those courts have uniformly held there is no redemption from a sale of this kind. So, whether the question is to be determined upon authority or upon grounds of public policy and convenience, we are of opinion the circuit court properly held there is no redemption from a sale of this kind.

*Decree affirmed.*

Mr. Justice Walker: I am unable to concur in holding the road could be sold without redemption. The opinion concedes that a large portion of the property was real estate, and the statute expressly declares such property shall be sold subject to redemption. That right was cut off by this decree, and it is therefore erroneous. It is true a Federal court in this State long held that on a foreclosure of a mortgage, in that court, the mortgagor was not entitled to redemption, but the doctrine was repudiated by the Federal Supreme

Court, and it required conformity to our statutes and our decisions. Again, I am unable to concur in overruling anything decided in *Chicago, Danville and Vincennes Ry. Co.* v. *Loewenthal, supra,* although it may be in the way of sustaining this decree. That case was deliberately decided, and I think was correct. The opinion is, in my judgment, opposed to the doctrine of *Peck* v. *Bligh,* 37 Ill. 317, *Melendy* v. *Keen,* 89 id. 395. *Mellendy* v. *Austin,* 69 id. 15, and *Olds* v. *Cummings,* 31 id. 188, and other cases following this last named decision, and I can see no reason for ignoring the doctrine they announce.