### BELDEN v. BURKE et al.

*(Supreme Court, Special Term, New York County.  October, 1892.)*

RAILROADS—SALE OF BONDS—APPLICATION OF PROCEEDS.

> Where mortgage bonds are issued by a railroad, under a covenant in the mortgage that the proceeds therefrom shall be applied in improving the road, but the bonds are afterwards sold under an agreement by which the covenant is in effect abrogated, the proceeds being applied to the payment of an indebtedness due the purchasers and others from certain persons as individuals before the incorporation of the road, neither said purchasers nor a subsequent *bona fide* purchaser from them without actual knowledge of the covenant can enforce performance of the covenant, although the mortgage is expressed as for the benefit of all persons who shall become holders and owners of the bonds.

Action by James J. Belden against Stevenson Burke and others to enforce a covenant in a mortgage given by the Columbus, Hocking Valley & Toledo Railway Company as to the application of the proceeds of certain bonds. Judgment for defendants.

*John F. Dillon, Elihu Root,* and *Samuel B. Clark,* for plaintiff.  *Joseph H. Choate, Benjamin H. Bristow, David Wilcox, John L. Simpson,* and *Thomas Thatcher,* for defendants Winslow, Lanier & Co.  *Stevenson Burke, in pro. per.  Hugh L. Cole* and *George A. Strong,* for defendant Ellis.  *James W. Hawes,* for defendant Andrews.

INGRAHAM, J.  The defendant the Columbus, Hocking Valley & Toledo Railway Company, a railroad corporation organized under the laws of the state of Ohio, and owning and operating a line of railroad situated in that state, issued in the year 1881 8,000 bonds of $1,000 each, and secured the payment thereof by a mortgage to the defendant the Central Trust Company, as trustee for the holders of such bonds, upon its railroad and other property. The plaintiff, as the owner of 50 of those bonds, aggregating $50,000, demanded of the defendant the trust company that, as trustee, it enforce a covenant in that mortgage as to the application of the proceeds of the 8,000 bonds before mentioned, and the trust company having refused or failed to take proceedings to enforce such covenants, this action was brought by plaintiff, having made the trust company a party, and by it he seeks to enforce that covenant for the benefit of himself and the other holders of the bonds.

The defendants deny the right of the plaintiff to maintain this action, and the question presented at the threshold of the case is whether the plaintiff, as the owner of the bonds held and owned by him, is entitled to ask a court of equity to enforce that covenant.  The bonds before mentioned were dated October 1, 1881, were payable to bearer at the agency of the obligor in the city of New York on the 1st day of September, 1931, with interest at the rate of 5 per cent. per annum, and recited their execution, as authorized by the resolution of the board of directors duly empowered thereto by the written consent and direction of the stockholders of the said company, and that their payment was secured by a mortgage to the Central Trust Company of New York, as trustee, upon all of its franchises, lines of railway, telegraph equipment, and all other property pertaining to the said railroad company then owned, or in future to be built or acquired; and the bond further provided: "In case of the nonpayment of any installment of interest on this bond as the same becomes due, the principal sum thereof shall, at the option of the holder,

become due and payable at the expiration of six months. thereafter, if such default so long continue."

The mortgage to secure which this bond was given was dated the 1st day of October, 1881, recited the incorporation of the railway company, a description of the railway and other property owned by it, and the existence of certain other bonds that were a first lien upon the property of the railway company or some portion thereof, and then contained the following: "Whereas, the said railroad company, the party of the first part, for the purpose of providing for the redemption and cancellation of the bonds secured by said prior or divisional mortgages, to enable it to borrow a further sum of money found necessary to be used in building and double-tracking its road, paying for property purchased and to be purchased, improvements made and to be made, and for the equipment of its said line of railroad, providing terminal facilities, constructing docks, building bridges, and otherwise extending and enlarging its capacity for the transportation of freight and passengers, and for other general purposes of said railway, and for the purpose of resolving its entire bond and mortgage indebtedness into one loan secured by one consolidated mortgage, has, by its board of directors and all its stockholders, resolved to issue its bonds payable in gold coin of the United States in the sum of $14,500,000." The mortgage, after setting out a copy of the bond to be issued, further recites that the said railroad company, having been advised and having determined that it was expedient and desirable to consolidate and provide for the divisional bond aforesaid, as thereinbefore and thereinafter recited, by and into one class of bonds to be secured by a single mortgage, and for double-tracking, equipping, and perfecting said line of railroad, and to extinguish as rapidly as possible all separate existing mortgages, for that purpose the said directors and stockholders did pass certain resolutions providing for the issue of the bonds and the execution of a mortgage to secure the payment thereof, which resolutions are set forth in full in the mortgage. Such resolutions, after providing that $6,500,000 of the bonds should be held and reserved by the trustees for the purpose of providing money for the payment of the outstanding bonds, continued as follows: "Resolved, that the remaining 8,000 bonds, amounting to $8,000,000, shall be sold and disposed of by the president and executive committee, and the proceeds thereof shall be applied for the purpose of double-tracking, equipping, and increasing the transportation facilities of and improving the company's railway, and in purchasing such real estate and other property as, in the judgment of its board of directors, or of the president and executive committee, the interests of said company require." The mortgage then grants to the defendant the Central Trust Company, for the purpose of securing the payment of said bonds to be made and executed in an amount of $14,500,000, all of its railroad and other property, and the coal company also grants and conveys to the said trust company, as such trustee, all of its coal lands for the use, benefit, and security of the several persons and their successors, administrators, executors, and assigns, who shall hereafter become the owners and holders of any of the bonds before mentioned. The said mortgage then contains the following covenant: "And it is hereby expressly covenanted and agreed by and between the parties hereto, each covenanting and agreeing respectively for themselves and their successors and assigns, and for the benefit and use of all parties who shall become holders and owners of the bonds issued under and secured or intended to be secured hereby in manner following, that is to say:  *  *  * *Fifth.* Eight thousand of said bonds, amounting to eight millions of dollars, numbered from one to eight thousand, shall be at once executed by the president and secretary of said railroad company and certified by said Central Trust Company of New York, trustee, and delivered to the president and vice president, or either of them, of said party of the first part, the Columbus, Hocking Valley & Toledo Railroad Company, to be used and disposed

of by them in accordance with the stipulation hereinbefore contained." Bonds to the amount of $8,000,000 were duly executed by the railroad company and delivered to the Central Trust Company, as trustee, and the mortgage was duly recorded.

The railroad company on the 28th of September, 1881, passed the following resolution: "Resolved, that the Central Trust Company of New York be and it is hereby authorized and directed to deliver to M. M. Green, president, and S. Burke, vice president, or either of them as they may agree, 8,000 bonds of the value and amount of $8,000,000, secured by the consolidated mortgage executed to said trustee by this company, and authorized to be delivered to the Columbus, Hocking Valley & Toledo Railroad Company." By an order dated November 2, 1881, signed "The Columbus, Hocking Valley & Toledo Railroad Company. By M. M. Green, President, and Stevenson Burke, Vice President," the Central Trust Company was directed to deliver to Burke 6,411 bonds. At the foot thereof an order was signed by Burke, whereby the Central Trust Company was directed to deliver the said bonds to the defendants Winslow, Lanier & Co., and the said bonds were delivered by the Central Trust Company to Winslow, Lanier & Co. between November 4 and November 7, 1881. These bonds so delivered in pursuance of this order were sold by Winslow, Lanier & Co., and the proceeds thereof applied to the payment of certain notes executed by the individuals known as Burke and his associates, representing a certain indebtedness that had existed from Burke and his associates to Winslow, Lanier & Co. and Drexel, Morgan & Co. prior to the incorporation of the railway company; and I shall assume that no part of the proceeds of those bonds, or of the remaining bonds which went to make up the 8,000 bonds issued under this mortgage, were ever applied to double-tracking the road, or to the purchasing of any property for the road which the road was authorized to purchase under the law of the state of Ohio, all of such bonds, or the proceeds thereof, having been appropriated by Burke and his associates to their own use. I realize that this last conclusion is strenuously denied by the defendants. Assuming it to be correct, however, I think that neither the plaintiff nor the trust company, as trustee for the plaintiff, are entitled to enforce this covenant.

We will assume that, on the delivery of these bonds by the Central Trust Company to Burke, he received them as vice president of the company, under the authority conferred by the fifth covenant contained in the mortgage before cited, and that thereby he assumed, as vice president, the duty to use and dispose of them in accordance with the stipulation contained in the mortgage, and he became a trustee for the proper disposition of the proceeds of the bonds, when sold by him, for both the company and for the Central Trust Company as trustee for the bondholders; that the proceeds of such bonds were impressed with a trust to carry out the objects for which the bonds were issued, and that his sale of those bonds to Winslow, Lanier & Co. was the first valid disposition of the bonds, and was made by Burke on behalf of the company as its vice president to carry out the provisions of the mortgage. Winslow, Lanier & Co. th n became the owner of the bonds, being indebted to the railroad company, or to Burke as vice president thereof, for the purchase price therefor. It must also be assumed that Winslow, Lanier & Co. are chargeable with notice of the mortgage and the covenants therein contained, and having such knowledge, at the request of Burke and his associates, and with the consent of the corporation, applied the purchase price of these bonds to the payment of the debt due by Burke and his associates to themselves and Drexel, Morgan & Co., so that, with full knowledge on their part, the proceeds of these $6,411,000 of bonds were not applied as the railroad company expressly covenanted they should be applied.

Just here the relations that existed between Winslow, Lanier & Co. and

the railroad company, at the time they held those bonds and made the application of the proceeds as before stated, must be determined.  Winslow, Lanier & Co. had become the owners of the bonds; they owed to the railroad company the purchase price therefor; the railroad company and all of its stockholders had authorized them to apply the proceeds for the benefit of Burke and his associates, in violation of this covenant in the mortgage before mentioned, and in pursuance of such authority such application had been made.  It is very clear that at this time Winslow, Lanier & Co., as holders of the bonds purchased by them, could not have insisted that Burke and his associates should pay the amount realized from the bonds to the railroad company for the purpose of enforcing this covenant.  They had acquiesced in the arrangement between Burke and his associates and the railroad company which resulted in the appropriation of the proceeds of these bonds in a manner different from that provided for in the mortgage, and were themselves a party to the agreement by which the proceeds were so diverted, and had themselves received and applied the proceeds to the payment of Burke's debt to themselves.  They therefore were estopped from asking the trustee to enforce that obligation on their part as holders of these bonds, and any application on their part to a court of equity to enforce the covenant contained in the mortgage would have been refused, as they themselves were parties to the transaction by which the proceeds of the bonds were so diverted, and profited by it.  The evidence shows that the bonds owned by the plaintiff, and upon his ownership of which he bases his right to require the trust company to enforce this covenant, were a part of the bonds purchased by Winslow, Lanier & Co., before mentioned; and the first question presented is whether the plaintiff, as holder of those bonds, having subsequently purchased the same without notice and for value, stands in any different or better position than Winslow, Lanier & Co. stood in at the time they owned the bonds.

No question of estoppel is presented, as the plaintiff testified that at the time he purchased the bonds he had no knowledge of this special covenant contained in the mortgage as to the application of the proceeds hereafter. The bonds are negotiable instruments, and plaintiff, upon their purchase for value and before maturity, became entitled to recover from the railroad company the amount agreed to be paid thereby, regardless of any equities or defenses that existed as between Winslow, Lanier & Co. or Burke and his associates and the railroad company.  I think it clear, also, that in case of a default in the payment of the bonds or interest thereon, plaintiff, or the trustee on his behalf, would be entitled to have enforced the mortgage given to secure the payment of the bonds.  By the express covenants in the mortgage it was executed and delivered to the trustee for the benefit and use of all parties who should become holders and owners of the bonds described, and thus the mortgage was given to secure the payment of the money provided to be paid by the bonds at the time the same should become due to the persons who should then be the holders thereof.  It was thus the express intention of the parties, as evidenced by their express covenant, that a holder of a bond, at the time the amount payable under it should become due, should be entitled to enforce the mortgage to secure its payment in case the railroad company should fail to pay.  Where a mortgage is given to secure to the payee of a negotiable promissory note the amount to be paid thereby, and a transferee of the note, purchased for value and before maturity, seeks to enforce the mortgage, the equities that exist as between the mortgagor and the mortgagee, which could be pleaded as a defense to such an action to foreclose the mortgage, would be naturally divided into two classes, the first of which would affect the validity of, or amount due on, the negotiable instrument to secure which the mortgage was given; the second of which would affect the validity of the mortgage itself; so that, conceding that there was an amount due upon the negotiable instrument, yet the plaintiff would not be entitled to en-

force the payment of that amount out of the mortgaged property, because the mortgage itself, as disconnected from the instrument which it was given to secure, was void. It seems to me clear that the first defense would be ineffectual, as the mortgage having been given to secure the amount due upon the negotiable instrument, whatever is due upon that is secured by the mortgage. While it seems to be equally clear that the second defense would be good because it has nothing to do with the right acquired by the purchase of the negotiable instrument, and if the execution of such a mortgage was procured by fraud, although the defendant could not claim that there was nothing due on the note because that was also executed by fraud, he could insist that the mortgage to secure which the note was given was void, and I can see no reason why that would not be a good defense in an action to foreclose the mortgage.

There is, however, a plain distinction between the covenant that plaintiff now asks to enforce and the mortgage by which the mortgaged property was to be applied to the payment of the mortgage debt in case the railroad company failed to pay it when due. The mortgage is, by its terms, to be enforceable only upon the failure of the obligor to pay the amount due upon the bonds in favor of the individual who shall then be the holder and owner of the bonds. This covenant, however, is to become operative as soon as the bonds are sold. So long as the bonds remain unsold in the hands of either the railroad company, the trust company, or Burke, either individually or as an officer of the railroad corporation, no liability on the part of the road existed either upon the bonds, the mortgage, or this covenant now sought to be enforced. The trust company individually had no interest in the bonds, and there was no consideration for an agreement by the railroad company to the trust company as to the disposition of the proceeds of the bonds when sold, nor, if there was such an agreement with the trust company, could it be enforced in this action, as here it is only the obligation of the railroad company to the trust company, as trustee for the plaintiff as a bondholder, that the court can enforce. In this case bonds were issued accompanied with a covenant that the proceeds should be applied to a particular purpose. The bonds were then issued and disposed of under an agreement by which that covenant was in effect abrogated, the proceeds of the bonds being applied by agreement between the parties to an entirely different object. The covenant was thus, in effect, abrogated by the mutual consent of the parties then interested in the bonds before it ever became in fact operative, and that is so whether this transaction be regarded as a sale of the bonds by the company to Burke and his associates, or that transaction held to be invalid, and the first sale of the bonds held to be the sale by Burke to Winslow, Lanier & Co., for Burke and his associates and Winslow, Lanier & Co. were parties to the agreement by which the proceeds of the bonds were applied, not as provided for in the mortgage, but to pay the individual debts of Burke and his associates. Upon plaintiff's purchase of these bonds, they being negotiable instruments, he acquired the right that the purchase of such an instrument gives to the holder thereof, but did that right include a right to enforce the collateral obligation, made by the maker of a negotiable instrument at the time it was executed, as to the application of its proceeds in his hands, but which had been, with the consent of all interested, abrogated? A consideration of the principles upon which the holder of a negotiable instrument can acquire a right superior to that of his transferrer will, I think, conclusively show that it did not.

When the rule that choses in action were not transferable was first relaxed in favor of negotiable instruments, certain characteristics were given them, whereby a holder for value before maturity acquired not only the right to enforce the instrument in his own name, but also to enforce the same, notwithstanding any defense which the maker had against any prior holder; but these characteristics applied only to the negotiable instrument itself, not to any

collateral obligation or contract which did not specially regulate the payment of the money to be paid. It was an instrument whereby a sum of money was to be paid at a stated time; that was a negotiable instrument; and it was such an instrument only that by the common law could be transferred and become negotiable. If the instrument contained any other provisions except such as required the payment of a sum of money, it did not acquire the character of a negotiable instrument. The characteristics thus acquired by negotiable instruments are stated in Daniels on Negotiable Instruments, (volume 1, p. 2,) where it is said: "That while choses in action are now transferable, a negotiable instrument is the only species which carries by transfer a clear title and a full measure, and, like an instrument under seal, imports consideration. It has therefore three peculiar and distinguishing characteristics: *First*, respecting the title, that a person acquiring it in the usual course of business before maturity, and for a valuable consideration, may hold it as against the world; *second*, respecting the amount, that negotiable paper carries the right to the whole amount it secures on its face, and is subject to none of the defenses which might have been made between the original or intervening parties against any one who acquired it in the usual course of business before maturity; and, *third*, respecting the consideration, it *prima facie* imports a consideration. The right that the holder of a negotiable instrument acquires, therefore, is that his title cannot be impeached. He is entitled to recover the amount specified, and consideration is presumed."

An examination of a few cases in which this subject has been considered will illustrate the limit to which the right of the holder of a negotiable instrument is restricted. In *Lamourieux* v. *Hewit*, 5 Wend. 308, SAVAGE, C. J., says: "Promissory notes are negotiable only by virtue of the statute, but this negotiable quality is not extended to any other instrument relating to the note." The case of *Watson's Ex'rs* v. *McLaren*, 19 Wend. 565, affirmed by the court of errors, 26 Wend. 430, well illustrates this principle. The testator of the defendant, by a separate and distinct instrument containing no words of negotiability, not indorsed or written upon the note, guarantied the payment of the note at 60 days, describing the note. The payee transferred by indorsement the note to one Frye, and Frye, after the note became due, transferred it to the plaintiff. It was held that this separate guaranty was not negotiable, and could not be assigned so as to authorize the assignee to bring a suit thereon in his own name. See, also, *Birckhead* v. *Brown*, 5 Hill, 644, where it was held that an agreement that certain bills of exchange should be honored by the drawees did not pass to the transferees of the bills, the court saying: "With us it is a settled question that special contracts other than bills of exchange and promissory notes are not negotiable instruments, and that no one can sue in his own name but an original party to the contract." And this principle was applied by the supreme court of the United States in *Central Trust Co.* v. *First Nat. Bank*, 101 U. S. 68, and reaffirmed by the court of appeals in *Barlow* v. *Myers*, 64 N. Y. 44. In that case the court said: "So, if a mortgage should be given to secure negotiable paper, the mortgage would not be negotiable, although it would pass to the indorsee of the paper as incident to the debt, and the transfer by the party to whom a personal covenant is made of his interest therein does not make the person receiving it the covenantee." In the case of *Baily* v. *Smith*, 14 Ohio St. 406, the supreme court of Ohio, in an opinion reviewing all the authorities, held that where a negotiable promissory note secured by a mortgage on real estate is transferred to a *bona fide* holder, and for value, and before maturity, a defense that the mortgage was obtained by fraud by the mortgagee or payee of the note was a valid defense in an action to foreclose the mortgage by the transferee. The cases, of which *Railroad Co.* v. *Thompson*, 103 Ill. 187, is an example, which hold that the holder of a bond secured by a mortgage to trustees is entitled to enforce the mortgage upon the failure on

the part of the obligor to pay the bond, free of all equities that existed between the obligor on the bond to the person to whom it was originally issued, are not opposed to this principle. In these decisions the distinction before noted is applied, and the ground upon which the right of the bondholders is enforced is that the mortgage was to secure the payment of the amount due to any person who should be the holder of the bonds when they became due, according to the express intention of the parties when the mortgage was executed. It is not, therefore, that the mortgage itself becomes negotiable, but the parties, by their agreement, have provided that the mortgage shall be held as security for whatever is due upon the bond to any holder thereof when the bond becomes due, entirely irrespective of the methods by which the liability on the bond to the holder at the time is established.

How, then, can the holder of the bond which has come to him by purchase from Winslow, Lanier & Co. acquire the right to enforce a collateral covenant that Winslow, Lanier & Co. could not enforce? Certainly not because of the fact that the bond was negotiable, as this covenant did not have any relation to the title to the bond, the amount due thereon, the liability of the obligor, or the consideration. Nor do I think the provision in the mortgage before cited, whereby it is provided that the covenants and agreements contained in the mortgage are for the benefit and use of all parties who shall become holders and owners of the bonds issued under or secured by the mortgage, can give to this plaintiff, as a holder of the bond purchased from Winslow, Lanier & Co., any right of action to enforce this covenant which Winslow, Lanier & Co. did not have at the time they sold the bonds. As before stated, the covenant now sought to be enforced had no application to the payment of the bonds when they should become due. It was an independent covenant to be presently carried out, and it was broken by the very agreement under which the bonds were acquired by Winslow, Lanier & Co. Winslow, Lanier & Co. could not enforce that covenant, nor could the trust company, as trustee for Winslow, Lanier & Co., enforce it; and when an individual purchased from Winslow, Lanier & Co. the bonds that they held, he acquired just the right to enforce this covenant that Winslow, Lanier & Co. had, except so far as the negotiable character of the bonds gave him a right superior to that of Winslow, Lanier & Co., and the fact that the railroad company had made the covenant for the benefit and use of all the parties who should become holders and owners of the bonds could not revive a covenant which had been, as between the bondholders and the company, abrogated, where such a covenant was not by its terms to come into effect at the time subsequent to the sale of the bonds by Winslow, Lanier & Co., as was the covenant in relation to the application of the mortgaged premises to the payment of the bonds when due. It was the clearly expressed intention of the parties that that part of the mortgage which related to the application of the mortgaged premises should only become operative when the bonds should become due, and then only in case they should not be paid by the obligor, and it was the then owner of the bond who had the right to enforce that agreement. At no time prior could there be a breach of that agreement, nor could there be any one who could relieve the corporation from its agreement to pay the bonds, or have the proceeds of the mortgaged property applied to their payment. In the case of the covenant in question, however, it became binding as soon as the bonds were sold. Then the holders of the bonds could enforce it, and could also relieve the company from its obligation under it, and in the latter case I cannot see that a purchaser of the bondholder who had relieved the company from its obligation could have any right to compel its enforcement which his assignor had relinquished. At the time Winslow, Lanier & Co. sold these bonds to plaintiff's transferrer, there were two parties to the agreement, — one the obligor, the railroad company, the other the obligee, the trust company, as trustee for Winslow,

Lanier & Co., who had become the holders and owners of the bonds; and, when that agreement was abrogated by the very contract under which the bonds were sold, neither of the parties to the covenant could then have enforced it. All of the rights that the plaintiffs acquired by reason of the negotiability of the bonds are conceded, and have been so far recognized and the obligation performed, and, in the absence of any facts that would justify a finding that the defendants were estopped from denying that the money was in the hands of the railroad company for an investment as provided by the covenant in the mortgage, it seems to me clear that, as Winslow, Lanier & Co. had no right to enforce this covenant, the plaintiff has acquired no such rights by the purchase of the bond.

There was a suggestion made upon the argument that it might be held that the proceeds of these bonds became in equity a part of the property mortgaged under the covenant contained in the mortgage that it should be applied solely to the purchase of the property that would be covered by the mortgage. A moment's consideration, however, is sufficient to show that the covenant cannot be enforced upon such a theory, for, as a fact, there were never any proceeds either received by the railroad company or by its officers that could be applied under the covenant to the purchase of property. The bonds or their proceeds were appropriated by the officers of the company to their own use in violation of the covenant. No sum of money was therefore ever realized by the company or came into its possession which could be said to be the property that had been acquired by the company so as to be covered by the mortgage. I am aware that I have very imperfectly stated the reasons that have led me to this conclusion, but the result has been arrived at after a full and careful consideration, and I am clearly of the opinion that, on the facts proved before me, plaintiff has no cause of action.

Judgment is therefore directed for defendants, with costs.